Janet MANLEY, Administratrix of the Estate of Lee Ann Manley, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 88–69V.

United States Claims Court.

Nov. 16, 1989.

Michael R. Hugo, Boston, Mass., for petitioner.

Charles Gross, Dept. of Justice, Washington, D.C., with whom was Barbara Hudson, Dept. of Health and Human Services, Washington, D.C., for respondent.

## OPINION [1]

ROBINSON, Judge.

This is an action for compensation for the vaccine-related injury and death of Lee Ann Manley (hereinafter Lee Ann) brought on December 1, 1988 by Lee Ann's mother, Janet Manley, as Administratrix of the estate of Lee Ann Manley (hereinafter petitioner) under the National Childhood Injury Program, 42 U.S.C. § 300aa–10, et seq. (West Supp.1989) (hereinafter Vaccine Act or Act).

*Litigation Background*

Special Master LaVon French heard the matter on April 24, 1989 in Washington, D.C., pursuant to pretrial orders issued on March 10, 1989, and on April 4, 1989. Prior to the hearing, respondent furnished petitioner with a copy of the VICP Medical Review Case No. 18–69V (hereinafter Medical Review) prepared by Dr. Cynthia McCormick, an employee of respondent. The Medical Review contradicted petitioner's claim that a diphtheria, pertussis and tetanus (hereinafter DPT) shot caused Lee Ann's injury and death. It maintained that Sudden Infant Death Syndrome (hereinafter SIDS) caused Lee Ann's death. When respondent's counsel offered it at the hearing, Special Master French, upon petitioner's objection to its admission under the Federal Rules of Evidence, reserved her ruling on its admissibility. Respondent's counsel also offered Dr. McCormick's affidavit which contained a more detailed explanation of matters in the Medical Review and certain new materials including a bibliography of articles, a curriculum vitae of Dr. McCormick, a copy of the Medical Review, five articles (learned treatises), and a memorandum concerning her conversation with Dr. William Parks, a pathologist who performed the autopsy on Lee Ann. Petitioner objected to the admission of this hearsay evidence under the Federal Rules of Evidence. Petitioner also objected unsuccessfully to the cross-examination of his witnesses. The Special Master reserved her ruling on the admissibility of the Medical Review, affidavit and exhibits and also on the admissibility of petitioner's learned treatises.

In an order issued May 1, 1989, the Special Master allowed the filing of post-trial briefs and other specified filings. Although the Special Master's May 1, 1989 order extended from May 5, 1989 to May 9, 1989, the required filing date for certain

---

1. This opinion may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this opinion, the parties shall designate any material

subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this opinion there are no objections filed within the fourteen (14) day period, then it

written submissions[2] set forth in her earlier orders of March 10, 1989 and April 4, 1989, this extension did not excuse the requirement of the pretrial orders that the parties file their lists of exhibits and witnesses prior to the April 24, 1989 hearing.

The Special Master filed her Report and Recommendations for Judgment (hereinafter Report) on July 23, 1989. The Report rejected respondent's contention that Lee Ann's death was due to SIDS, allegedly a factor unrelated to the administration of a DPT shot which Lee Ann had received on the date of her death. Thus, the Report found that petitioner had met her burden of showing by a preponderance of the evidence that the DPT shot injured her and caused her to suffer a shock collapse or hypotonic-hyporesponsive episode and that Lee Ann died as a result of such injury.

The Report accepted some of respondent's exhibits but rejected the rest of respondent's evidence as inadmissible hearsay under the Federal Rules of Evidence, accepted petitioner's treatises into evidence, rejected petitioner's request for attorneys' fees and costs exceeding $30,000, recommended that petitioner be awarded $250,000 as mandated by § 300aa–15(a)(2) of the Vaccine Act, and awarded $30,000 for attorneys' fees. However, the Report recommended no award for lost wages, pain and suffering, and costs.

This action is now before the court on respondent's objection to the Report. Although petitioner had timely filed an objection to the Report's limitation of the attorneys' fees award to $30,000, at a status conference before this court petitioner orally withdrew this objection. Respondent's objection, which petitioner opposes, is to the exclusion of Dr. McCormick's affidavit, exhibits, and Medical Review.[3] The parties have completed all briefing pursuant to the Special Master's post trial order.

After careful consideration of the entire record, including the testimony of petitioner's expert witness, Dr. Marcel Kinsbourne and Mr. and Mrs. Manley, all of petitioner's and respondent's exhibits which the Special Master admitted, and all other properly submitted evidence of record, the court rejects the respondent's objection to the Report for the reasons hereinafter set forth and adopts the Special Master's Report and Recommendation for Judgment.

DISCUSSION

Special Master French's Report ruled that the respondent's bibliography and five learned treatises were admissible, but the Medical Review, the affidavit, and all other exhibits to the affidavit were inadmissible. She found that the bibliography and the five articles were offered not to present evidence about this particular case, but about the general state of scientific knowledge. She noted that petitioner had no objection to admission of the articles. She ruled that the articles or treatises which both parties offered were admissible.

 Clearly, the Medical Review, Dr. McCormick's affidavit, and excluded exhibits were offered in violation of Special Master French's prior orders because respondent did not list them as exhibits to be offered at the hearing. The Special Master could have justifiably excluded such evidence at the hearing for that reason alone. Although the Report does not specifically refer to respondent's violation of the pre-

---

shall be deemed that there is no material subject to § 300aa–12.

**2.** The written submissions allowed to be filed after the hearing referred to memoranda of contentions of fact and law and other filings required by paragraphs 9–15 of the March 20, 1989 order.

**3.** Respondent's objection does not allege that the findings of the Special Master are in error with respect to the merits of the petition and her recommendation for an award of compensation of $250,000. At a status conference held on November 6, 1989, respondent's counsel stated that implicit in his objection to the Special Master's Report is the argument that, based upon the excluded evidence, the Special Master's award of compensation was erroneous. However, respondent does not argue this in his objection or point to specific contentions of Dr. McCormick regarding causation. Respondent's only stated objection is to the alleged error of the Special Master in excluding respondent's evidence. In its response to petitioner's objection, however, it opposed any award of attorneys' fees.

trial orders as an additional ground for exclusion of respondent's evidence, this court is not precluded from considering such a violation as a justifiable basis for exclusion of respondent's evidence. The principal reason, however, for exclusion of the described evidence is that that evidence offered constituted inadmissible hearsay under the Federal Rules of Evidence, which, without question, are applicable in this court. Respondent elected not to have a witness at the hearing to present its evidence and withstand cross-examination on that evidence. Thus, the Special Master had insufficient assurance as to the truth, validity, or trustworthiness of respondent's hearsay evidence. That is true of this court's consideration of respondent's excluded evidence. Finally, copies of the affidavit and excluded exhibits, with the exception of the Medical Review, were not furnished to petitioner prior to the hearing. To admit such evidence would have constituted prejudice and surprise to petitioner's case. For all of these reasons, the court finds the Special Master did not err in excluding respondent's evidence. *See Thomas Matthews v. Secretary of the Department of Health and Human Services,* 18 Cl.Ct. 514 (1989).[4]

■ The court has carefully considered remanding this case to the Special Master for an additional expedited evidentiary hearing accompanied by an order to respondent that Dr. McCormick appear and testify respecting the causation issue and respondent's excluded exhibits so that this evidence may become part of the record and receive due consideration. *See, e.g., Rochester v. United States,* 18 Cl.Ct. 379 (1989). However, respondent has a stated "policy" of not producing any witnesses at any evidentiary hearings whether before the Special Master or this court. Indeed, respondent's attorney, Mr. Charles Gross, expressly reiterated this policy at a status conference before this court held on November 6, 1989. In other vaccine cases, respondent has made the same policy statement. Apparently, respondent will not allow Dr. McCormick to testify under any circumstances no matter how brief or reasonable the requirements may be. In fact, in *Matthews* respondent refused to allow her to even testify by telephone and at her convenience. In these circumstances a remand would likely result in a failure or refusal by respondent to comply with the order to produce Dr. McCormick at a hearing. Thus, a remand at this juncture probably would not result in the introduction of additional probative evidence on the key issue of causation. Moreover, a remand could substantially delay a prompt resolution of the case in contravention of the Vaccine Act's expressed purpose of securing an expedited resolution of these cases. The court therefore finds that such a remand would constitute a useless act under the particular circumstances of this case.

■ Petitioner and respondent disagree as to whether § 15(f)(4) of the Act requires the payment of attorney's fees in a lump sum or whether attorneys' fees are payable in quarterly installments. After a careful review of the statute and the accompanying legislative history, the court finds that the provision of § 15(f)(4)(B) directing payment of "compensation to a petitioner" in retroactive cases be made in equal quarterly installments does not apply to attorneys' fees. *Rochester v. United States,* 18 Cl.Ct. 379 (1989). Congress clearly intended that fees and costs be distinct from "compensation." This distinction is evidenced by the fact that Congress has made the recovery of attorneys' fees available even if the petitioner is not awarded "compensation." § 300aa–15(e)(1). As a result, this court agrees with the result reached on this issue in *Rochester v. United States,* 18 Cl.Ct. 379

**4.** If the court is wrong in its interpretation of the requirements of the pretrial orders and application of the Federal Rules of Evidence, the court is nevertheless persuaded, after a careful review of all of the excluded evidence offered at the hearing by respondent's counsel that such evidence, since it was untested by cross-examination or other assurances of trustworthiness, is entitled to little or no weight; and, in any event, would be insufficient to support respondent's contention that Lee Ann's injury and death were due to SIDS and not to the DPT shot. Thus, the court finds that rejection of this evidence by the Special Master, if error, was harmless error.

(1989), that attorneys' fees are not "compensation" for purposes of § 15(f)(4)(B).

## CONCLUSION

Respondent's objection to the Report is without merit and is rejected. The court adopts the Report in its entirety. A copy shall be attached to this opinion. The Clerk is directed to enter judgment for petitioner in the total amount of $280,000, consisting of $250,000 in compensation which shall be paid in four equal annual installments of $62,500, and $30,000 in attorneys' fees. The first installment of compensation of $62,500 and the attorneys' fees of $30,000 shall be due and payable when this judgment becomes final. No additional costs.

## APPENDIX

### REPORT AND RECOMMENDATION FOR JUDGMENT *

Filed July 23, 1989

E. LaVON FRENCH, Special Master.

This case comes before the United States Claims Court pursuant to a petition filed under the National Vaccine Injury Compensation Program [1] (hereinafter the "Vaccine Act") in which the petitioner claims entitlement to compensation for the death of the minor child, Lee Ann Manley. An evidentiary hearing was held on April 24, 1989 in Washington, D.C.

Pursuant to 42 U.S.C. § 300aa–12(c) and Vaccine Rule 18(a), the undersigned recommends to the assigned Claims Court judge, Judge Robinson, that judgment be entered for petitioners under the Vaccine Act in the amount of $280,000 of which an amount of $30,000 is for attorneys' fees and costs.

## ISSUES

(1) The principal issue to be decided is whether the petitioner is entitled to compensation for the death of Lee Ann Manley under the provisions of the Vaccine Act. More specifically, the court must decide whether Lee Ann Manley suffered a hypotonic-hyporesponsive episode or anaphylactic shock and died as a result of such condition.

(2) A collateral issue relating to the admissibility of a written report and an affidavit prepared by respondent's medical expert, was raised at the hearing.

(3) Petitioner also raises the issue of whether cross examination is appropriate in proceedings under the Vaccine Act.

(4) Finally, the court is faced with the issue of whether the $30,000 cap on attorneys' fees is applied to the fees incurred in this action and any previous litigation on the same matter.

## STATEMENT OF FACTS

The following facts are supported by the record. Lee Ann Manley was born to Janet and Martin Manley on April 4, 1983 at the Brigham and Women's Hospital in Boston, Massachusetts. She was delivered by spontaneous vaginal birth without forceps. There is no evidence of any complications with the pregnancy or delivery. Dr. John Taub became the child's care physician. Petitioner's Exhibit No. 1 at 1 (hereinafter P.Ex. No. _____); Transcript of April 25, 1989 hearing at 14, 21, *Manley* (hereinafter Tr. at ____).

At birth, Lee Ann weighed seven (7) pounds 2½ ounces and measured 20 inches in length. Her head circumference measured 14⅛ inches. Apgar tests which measure heart rate, respiration, muscle tone, responsivity to stimulation, and skin color,

---

\* This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

1. The statutory provisions governing the National Vaccine Injury Compensation Program are codified in 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987).

conducted at one minute and five minutes after the birth of Lee Ann, resulted in scores of 8 and 9, respectively. Nurses' notes describe these scores as "good." P.Ex. No. 1 at 29.

Following delivery, it was discovered that the child suffered from a congenital dislocation of the left hip ("CDH") and an umbilical hernia. Subsequent consultations with an orthopedic doctor indicated that the CDH was not considered serious and could be treated and corrected with a harness. Consultation with a pediatric surgeon indicated also that the umbilical hernia was not serious and that if it did not correct itself, surgery could be considered within one or two years. Tr. at 22–26.

Lee Ann was discharged from the hospital on April 7, 1983. On follow-up visits on April 11, April 22, and May 6 and May 23, 1983, the orthopedic surgeon fit Lee Ann for a CDH harness and followed her progress. On two occasions, April 21 and May 4, 1983, the pediatric surgeon treated Lee Ann for the umbilical hernia. P.Ex. No. 1 at 39.

On April 25, 1983, Lee Ann was brought to see Dr. Joan Lebel, a participating physician in the Harvard Community Health Program (HCHP), for her first well-baby visit. Dr. Lebel described Lee Ann as a "healthy" baby, notwithstanding the CDH and umbilical hernia. Lee Ann was scheduled to return to Dr. Lebel six weeks from this date. *Id.*

Around the middle of May, Lee Ann suffered a cold. Concerned with the length of the child's cold, Mrs. Manley called HCHP three times between May 5 and May 31, 1983, seeking advice on whether she should have the child seen by HCHP personnel and how to care for her daughter's cold. The only medication given to Lee Ann for the treatment of her cold was Vicks' Vapo-Rub, an over-the-counter medication, which was applied directly to the child's chest. The cold made the child "a bit more fussy," and more difficult to feed, but, by the time of Lee Ann's second well-baby visit, her cold had substantially subsided. Tr. at 33–36.

On May 31, 1983, Lee Ann was brought by her mother to see Dr. Taub in his Wayland, Massachusetts office for her second well-baby visit. Mrs. Manley informed Dr. Taub about Lee Ann's cold. Lee Ann weighed 10 pounds and 10½ ounces and measured 23 inches in length. Her head circumference measured 41 centimeters. The doctor reported that Lee Ann was of a "good weight." As well, Dr. Taub noted that her hip condition had progressed satisfactorily as there was no "click" or abduction of the left hip at that time. P.Ex. No. 1 at 37.

Near the conclusion of the examination, the doctor administered to Lee Ann an oral polio vaccine and a diphtheria, pertussis, tetanus (DPT) shot in the thigh. Upon injection of the DPT shot, the baby immediately arched its back, rolled its eyes, and opened its mouth in a soundless cry, and then emitted a scream of such volume that it was heard by Mrs. Manley's sister who sat in the waiting room several feet away. Mrs. Manley attempted to comfort her child, but Lee Ann was inconsolable for a period of time. Mrs. Manley was warned that Lee Ann might run a fever as a result of the vaccination, and was advised to give her liquid Tylenol if she should develop a fever. *Id.;* Tr. at 38–41.

The child was somewhat quieter in the car. The ride home took about 15 minutes. At approximately 3:00 p.m., Mrs. Manley arrived home with Lee Ann. Mrs. Manley prepared a bottle and attempted to feed Lee Ann, but the child showed no interest in feeding, although it was her normal feeding time. Tr. at 41–43.

Martin Manley, Lee Ann's father arrived home at approximately 4:00 p.m. and then left the house on an errand. Mrs. Manley tried to feed Lee Ann; Lee Ann drank approximately 2 ounces which is about half the usual amount. Tr. at 47–48.

Because Mrs. Manley's sister was about to return to her home in California, Mrs. Manley's sister took a photograph of Lee Ann. Mrs. Manley testified that ordinarily Lee Ann was a happy alert child with darting eyes, and that she smiled "whenever you looked at her," but her appearance and

facial expression represented in the photograph taken the day of her death did not represent this. Tr. at 43–47.

When Martin Manley returned approximately 45 to 60 minutes later, Mrs. Manley told her husband about the happening at the doctor's office and the subsequent difficulties in feeding Lee Ann. She handed the child over to Mr. Manley so that she could go to the grocery store. It was approximately 5:00 p.m. Tr. at 47,144.

At the parking lot of the grocery store, Mrs. Manley ran into her sister-in-law, Nancy Manley. Nancy Manley left the parking lot, and with her boyfriend, drove to the Manley's house to see Lee Ann. Tr. 49–50.

After her mother left to go to the grocery store, Lee Ann began first to cry, and then to scream. The screams became increasingly more "hysterical," high pitched, and intermittent, such as Mr. Manley had never before heard. In an attempt to console her, Mr. Manley took the child outside to show her the flowers but the screams would not stop. After some time, however, the screams suddenly ceased and Lee Ann began to whimper. Believing the child might sleep, Mr. Manley put Lee Ann in her crib at approximately 5:30 to 5:45 p.m. Tr. at 146–147, 154–155.

Having put Lee Ann to bed, Mr. Manley went back outside. The house was small, just three rooms, and all the windows were open. He stood approximately 30 to 40 feet from where Lee Ann lay in her crib. Nancy Manley and her boyfriend pulled up in front of the Manley's house in the boyfriend's truck. After introducing her boyfriend to her brother Martin, Nancy proceeded into the house to see Lee Ann. Upon entering the child's bedroom, Nancy yelled to Mr. Manley that "something was wrong with the baby." Nancy then picked up the baby and walked from the bedroom with Lee Ann in her arms, repeating that there was "something wrong with the baby." The child's body was limp; her arms were hanging outward and to the side; her mouth was ajar; and her eyes were half open. Tr. 147–148.

Mrs. Manley returned to the house with two bags of groceries at the time Nancy Manley emerged from the room with Lee Ann in her arms. Mrs. Manley dropped her groceries and ran to Lee Ann. There appeared to be no discernable breathing. Mr. Manley attempted to resuscitate Lee Ann by giving her little puffs of air. Nancy Manley's boyfriend had been trained in CPR and also attempted resuscitation. Tr. at 50–51, 149–150.

The fire department and an ambulance were called, but all attempts to revive the child were futile and the child was pronounced dead at the Leonard Morse Hospital emergency room at 7:40 p.m. on May 31, 1983, approximately 5 hours after receiving her DPT vaccination. Tr. at 51–53; P.Ex. No. 1 at 38.

In performing an autopsy on June 1, 1983, Dr. William J. Parks, a pathologist with Leonard Morse Hospital, concluded that The clinical and pathological findings were consistent with Sudden Infant Death Syndrome (SIDS). P.Ex. No. 1 at 46.

## STATEMENT OF LAW

The legislative history of the Act acknowledges the difficulties and impossibilities of successfully litigating vaccine-related injury and death cases in the traditional setting.

[T]he opportunities for redress and restitution are limited, time-consuming, expensive and often unanswered. Currently, vaccine-injured persons can seek recovery for their damages only through the civil tort system or through a settlement arrangement with the vaccine manufacturer. Over time, neither approach has proven satisfactory. Lawsuits and settlement negotiations can take months and even years to complete. Transaction costs—including attorneys' fees and court payments—are high. And in the end no recovery may be available.

H.R. Rept. No. 908, 99th Cong., 2d Sess., pt. 1, at 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6347.

The purpose of the Act, then, was to provide an expedited process by which to compensate those eligible vaccine-injured

individuals or the estates of those who have died as a result of the vaccine administration. In that light, the Act seeks to establish a no-fault system of compensation in which the petitioner in a death or injury case does not have to demonstrate manufacturer's negligence or vaccine defectiveness. *Id.* at 6353.

The Act seeks to eliminate the difficult individual determinations of causation of injury by defining the conditions which give rise to a presumption of causation. Section 11(c)(1) essentially provides a check-list for the petitioner. If the petitioner is able to demonstrate each of the following elements by a preponderance of the evidence,[2] the court may then find that the petitioner is entitled to a presumption of eligibility. § 300aa–13(a)(1)(A).

 (1) The individual received a vaccine listed in the Vaccine Injury Table;

 (2) The vaccine was administered in the United States or in one of its trust territories;

 (3) The individual sustained or had significantly aggravated an injury set forth in the table in association with the named vaccine, or died within the time period set forth in the table;

 (4) The individual suffered residual effects from such injury for a period of greater than six months and incurred costs for more than $1,000 in unreimbursable expenses; or died as a result of the vaccine administration; and

 (5) No award or settlement has been collected in a civil action for damages for such vaccine-related injury and death.

Thereafter, if the respondent cannot show by a preponderance of the evidence that the injury or death was due to factors unrelated to the administration of the vaccine, the petitioner is thereby entitled to

compensation available under the Vaccine Act. *See* § 300aa–13(a)(1)(B). It should be noted that "unrelated" factors does not include "idiopathic, unexplained, unknown hypothetical, or undocumented factor, illness, injury or condition...." § 300aa–13(a)(2)(A).

The petition in the instant case alleges that the death of Lee Ann Manley is the result of the administration of a DPT vaccination. Section 300aa–14(a)I sets forth DPT-related table injuries: (1) anaphylaxis or anaphylactic shock, (2) encephalopathy or encephalitis, (3) shock-collapse or hypotonic-hyporesponsive collapse, (4) residual seizure disorder and (5) any acute complication or sequela (including death) of an injury referred to above. Petitioner must demonstrate that the child suffered one of the injuries listed in the table prior to the child's death to successfully establish a table case as required by section 300aa–11(c)(1)(C)(i).

## DISCUSSION

### I.

### ENTITLEMENT

■ For the reasons set forth below, it is the court's opinion that the petitioner has demonstrated by a preponderance of the evidence facts sufficient to warrant an award of compensation under the terms of the Vaccine Act.

### *Administered a Table Vaccine in the United States*

Medical records from the Harvard Community Health Plan dated June 1, 1983 show that Lee Ann received a DPT shot and polio drink on May 31, 1983 in the United States, specifically Wellesley, Massachusetts, thus satisfying the requirements of parts (A) and (B)(i)(I) of section 11(c)(1).[3] P.Ex. No. 1 at 37; Tr. at 37–40.

---

**2.** The preponderance of evidence standard requires that the trier of fact "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re: Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harland, J., concurring) *quoting* F. James, Civil

Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States,* 6 Cl.Ct. 476, 486 (1984).

**3.** Moreover, respondent, in its post-hearing submission, has conceded that parts (A), (B)(i)(I) and (E) of section 11(c)(1) have been satisfied.

### Previous Collection of Award or Damages

Janet Manley averred by sworn affidavit dated November 16, 1988 that petitioner has not previously received or collected an award or settlement of a civil action for damages related to the death of their daughter Lee Ann Manley. Furthermore, petitioners submitted as Exhibit No. 2 the order of the Superior Court of Massachusetts dated December 15, 1988 dismissing the action without prejudice to the petitioners. *See also* fn. 3, *supra.*

### Suffered a Table Injury

The issue of whether Lee Ann suffered a table injury, specifically a hypotonic-hyporesponsive episode or anaphylactic shock is disputed by respondent. Respondent contends that the evidence presented by petitioner in this case fails to demonstrate by a preponderance of the evidence that Lee Ann Manley suffered any of the injuries, disabilities, illness or conditions listed in the Vaccine Injury Table. Furthermore, respondent contends that there was no evidence to show that Lee Ann's death was the sequela to any such injury, disability,

illness or condition. Rather, respondent supports the diagnosis by Dr. William J. Parks, the doctor who performed the autopsy of Lee Ann Manley, that the child's death was due to Sudden Infant Death Syndrome (hereinafter "SIDS").

The court finds petitioner has presented sufficient evidence which demonstrates by a preponderance of the evidence that Lee Ann Manley suffered a hypotonic-hyporesponsive episode (hereinafter HHE) and died as a result of such injury.[4] The court rests its decision on two grounds. First, the process of reasoning by which Dr. Marcel Kinsbourne, the petitioner's medical expert, supported his opinion that an HHE occurred, is entitled to considerable weight. Second, the evidence presented by petitioner satisfies the statutory definition of "hypotonic-hyporesponsive episode."

*Expert Testimony of Dr. Marcel Kinsbourne.* Dr. Kinsbourne received a medical degree from Oxford University in 1955. He also obtained a British degree entitled a Membership of the Royal College of Physicians of London, the equivalent to the various specialty awards in this country. After graduation from Oxford, Dr. Kinsbourne completed post-doctoral training in

---

[Respondent] admit[s] that Lee Ann Manley received a vaccine set forth in the Vaccine Injury Table, specifically DTP, on May 31, 1985, in the United States, specifically, at the offices of the Harvard Community Health Plan, in Wellesley, Massachusetts. [Respondent] agree[s] that Lee Ann Manley died later that day, and was pronounced dead at 7:40 p.m. at the Leonard Morse Hospital, Natick, Massachusetts. [Respondent does] not dispute that Janet Manley has been properly appointed as the legal representative of the estate of Lee Ann Manley. Nor [does respondent] contend that an award of damages or a settlement has previously been obtained as a result of Lee Ann Manley's death.
Respondent's Post–Hearing Submission at 1–2.

4. The court considered also the possibility that the child suffered an encephalopathy. Encephalopathy is defined in the subsection of the Vaccine Act entitled "Qualifications and aids to interpretation" as follows:
[A]ny significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or

changes lasting at least 6 hours in level of consciousness, with or without convulsions. ... Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable [sic] crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy.
§ 300aa–14(b)(3)(A). Dr. Kinsbourne stated that he was unable to testify with medical certainty that Lee Ann suffered encephalopathy for the probable reason that death came too quickly for this and other underlying abnormalities to occur. Tr. at 72–74. He agreed that the unusual persistent cry described by Lee Ann's father, Tr. at 147–149, 154–155, is a common systemic reaction to DPT vaccination and is evidence of encephalopathy. Tr. at 96. He did not believe that this unusual crying was simply the manifestation of local pain due to the injection of the needle. *Id.* However, because these specific adverse reactions occurred so rapidly, Dr. Kinsbourne was not willing to state with certainty that her symptoms were sufficiently manifested so as to establish statutory encephalopathy. As well, evidence of persistent screaming alone is insufficient to demonstrate an encephalopathy. *See* § 300aa–14(b)(3)(A).

the specialties of neurology and pediatrics both in England and the United States. Upon permanent placement in the United States, he took and passed the American Board of Pediatrics. As well, Dr. Kinsbourne has held teaching positions at several universities. Dr. Kinsbourne sits on the editorial boards of several medical journals including *Developmental Neuropsychology, Brain and Cognition* and *Journal of Communication Disorders.* His curriculum vitae lists in excess of 250 publications and books that Dr. Kinsbourne has authored, co-authored or edited. He has received a number of academic awards and prizes. Dr. Marcel Kinsbourne is presently the Director of the Division of Behavioral Neurology at the Shriver Center in Waltham, Massachusetts. He is also a lecturer and clinical associate in neurology at Harvard University and Massachusetts General Hospital, an adjunct professor of psychology at Brandeis University and an adjunct professor of occupational therapy at Boston University. Dr. Kinsbourne's impressive credentials leads the court to find that Dr. Kinsbourne is qualified to testify as an expert as to the etiology of Lee Ann's condition and subsequent death.

Dr. Kinsbourne testified that, based on his differential diagnosis,[5] the medical records, and the autopsy report, Lee Ann suffered an HHE[6] in reaction to the DPT immunization. Dr. Kinsbourne reached this conclusion by ruling out other possibilities and based his opinion on a reasonable degree of medical certainty. Tr. at 69 and 74.

In his differential diagnosis, Dr. Kinsbourne ruled out that Lee Ann's post-DPT condition was the result of any pre-existing condition. He testified that the birth and well-baby visit medical records reveal that Lee Ann Manley was in good health prior to the DPT vaccination. Tr. at 67 and 81–82.

Dr. Kinsbourne eliminated the umbilical hernia and the congenital hip dislocation, both discovered at birth, as causes of Lee Ann's death. He testified that such conditions are "common congenital abnormalities," and would not have contributed to Lee Ann's demise. Tr. at 68. As well, the doctor dismissed respondent's implications that the child's condition and subsequent death was in any way attributable to her large head size. Dr. Kinsbourne concluded that the macrocephaly condition was familial, having found that the alternative explanations for such condition provided by respondent's medical review were non-existent. Tr. at 89. *See also* Mr. Manley's testimony, Tr. at 140.

As well, Dr. Kinsbourne considered brain trauma as a cause for death, but found no gross structural abnormalities in the brain

---

**5.** "Differential diagnosis" is defined as "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." *Dorland's Illustrated Medical Dictionary* 461 (27th ed. 1988).

**6.** Dr. Kinsbourne testified that HHE and anaphylaxis or anaphylactic shock are the same Dr. Kinsbourne explains as follows:

> [T]o my mind, [HHE] and [anaphylaxis or anaphylactic shock] can be aspects of the same situation. In other words, the anaphylactic may be the explanation of the shock so that in my opinion Lee Ann most likely met both those criteria ... Now, anaphylaxis refers to a very severe and acute allergic reaction to a foreign protein ... so acute and so severe that the person simply dies and dies in shock.... Now, pertussis is a foreign protein, the pertussis vaccine, and there have been records in literature of children dying in anaphylactic shock soon after being given the pertussis vaccine.... In my opinion she suffered anaphylaxis ... a poisoning effect ... render[ing] the various organs, and particularly the heart, incapable of sustaining the blood pressure. If the blood pressure is not sustained, oxygen in the blood cannot be pumped to the brain and the brain is short of oxygen and the brain dies, and that sequence of events is, in my opinion, compatible both with the clinical history and the autopsy findings.

Tr. at 76–79.

In respondent's post-hearing brief, respondent challenges petitioner's position relative to anaphylaxis or anaphylactic shock. However, respondent's argument is first raised in the affidavit of Dr. McCormick, respondent's medical expert, at the hearing, and subsequently found inadmissable under the Federal Rules of Evidence. *See* p. 812, *infra.* To consider the same evidence, albeit through a different vehicle, the post-hearing brief, would be inappropriate.

in his review of the autopsy findings, thus eliminating such causes as a blood clot in the brain, laceration of the brain and head injury. Tr. at 79–80.

Dr. Kinsbourne ruled out Sudden Infant Death Syndrome (hereinafter SIDS) as a cause for the child's death.[7] In Dr. Kinsbourne's opinion, the coroner misclassified Lee Ann's death as SIDS. Dr. Kinsbourne testified that a typical SIDS death is one in which a seemingly healthy child dies suddenly during the night while asleep. The doctor contrasted this scenario with the death of Lee Ann Manley.

> We cannot say that this child was perfectly normal and healthy and then was found simply dead, but rather she clearly had a reaction to the pertussis vaccine and that reaction went through more than one stage and culminated in her death, so I think that the comparison with Sudden Infant Death Syndrome is incomplete in that this is not simply, in my opinion, a child that mysteriously stops breathing.

Tr. at 81.

Unlike a typical SIDS case, Lee Ann's death was not sudden, but rather was the culmination of a sequence of events starting with the DPT administration. *Id.* "[T]he child, after crying very energetically became still and unresponsive and then very soon afterwards was found to have died." Tr. at 74. In Dr. Kinsbourne's view, such a reaction is indicative of an anaphylactic shock-like episode. Dr. Kinsbourne further testified that the autopsy findings and medical literature[8] are con-

sistent with this diagnosis. Tr. at 77, 79, and 113.

Having eliminated all other alternative etiologies, Dr. Kinsbourne concluded with a reasonable degree of medical certainty that Lee Ann suffered an HHE or shock-collapse and died as a result of such condition within five hours of the vaccination. Tr. at 77–81 and 92–93.

*Statutory Guidance.* The Vaccine Act sets forth qualifications and aids to interpretation for the condition shock-collapse or hypotonic-hyporesponsive episode:

> A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete, hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

Section 300aa–14(b)(1).

The record supports a finding that Lee Ann suffered such condition. Mrs. Manley testified that after the administration of the vaccine, Lee Ann acted differently from her normal self. Lee Ann was ordinarily a bright, alert child, according to her mother, with eyes "so keen and alert, always looking around." Tr. at 45. On this occasion, however, Lee Ann was "just kind of limp ..." Tr. at 45. Mrs. Manley stated further that "even the way she drank ... was slower—everything was going slower." *Id.* Although it was time for her bottle,

---

**7.** Differences of opinion exist as to whether there is a causal connection between Sudden Infant Death Syndrome (SIDS) and the DPT vaccine. As such, whether such causal connection exists is a matter for the scientific community, and not the court. In creating the National Vaccine Injury Compensation Program, Congress intended to provide compensation to eligible petitioners without the difficulties of proving a causal connection between the vaccine and the subsequent injury and/or death. The petitioner, therefore, need not demonstrate a causal relationship between DPT and SIDS. Thus, where a petitioner can demonstrate, *inter alia,* the receipt of a table vaccine and the sustaining of a table injury, the petitioner is pre-

sumed entitled to compensation. The issue of whether there exists a causal relationship between DPT and SIDS is not relevant to this decision. The court, then, need not interject itself into the forefront of this debate.

The only significance to this case of the classification of SIDS is that the cause of death remains unknown and therefore, an HHE must be considered as an explanation for the child's death.

**8.** Dr. Kinsbourne cited the article: Werne and Garrow, "Fatal Anaphylactic Shock", 131 J.A. M.A. 730 (June 29, 1946). See Petitioner's Exhibit No. 8.

she was disinterested in eating, taking only a small amount of milk with slow sucking motions as demonstrated by her mother during the hearing. Tr. at 46. Her arms hung at her sides in an unusual fashion. *Id.* These statements describe a decrease or loss of muscle tone included in section 300aa–14(b)(1) among the indicia of HHE. A photograph taken approximately two hours before her death differs considerably from other photographs offered into evidence. In the photograph taken on May 31, 1983, the day of her vaccination, Lee Ann's eyes seem glassy and staring, and her pose appears uncharacteristically limp and unresponsive. P.Ex. No. 3, 4, and 5. Mr. Manley stated that, following the episode of persistent unusual screaming, *see* fn. 4, Lee Ann was "whimpering," and he thought she was "exhausted." Tr. at 147.

*Death as a Sequela to or Acute Complication of Hypotonic–Hyporesponsive Episode.* Respondent contends that death is not a sequela to an HHE episode as no published study has reported a death following such episode.[9] Dr. Kinsbourne conceded that he has found no such study documenting a death following an HHE episode. He testified, however, that death following HHE, although rare, does occur. Tr. at 94. He explained that the failure of such studies to show death after HHE is more a factor of the sample size of such studies than the probability of its occurrence. Tr. at 95. The fact that HHE is not typically fatal, however, is irrelevant.

*Temporal Proximity.* Respondent argues that the fact that the death occurred within close temporal proximity to the administration of the DPT vaccination is irrelevant in this case. Respondent argues that the statute requires that the petitioner show that the child's death was due to the aggravation of one of the injuries listed in the Vaccine Injury Table. The court agrees that without other evidence, such temporal relationship is insufficient in itself to show that the child died from the administration of such vaccine. Petitioner, however, has sufficiently demonstrated that the child suffered an HHE episode within 72 hours, as required by the Vaccine Table, and died as a result.

As respondent concedes that it will not be able to rebut the petitioner's presumption of entitlement with evidence of factors unrelated to the vaccine should the court find that petitioner has met its burden of proof, Respondent's Post–Hearing Submission at 2, petitioner is, therefore, entitled to compensation under the Act.

II.

ADMISSION OF RESPONDENT'S MEDICAL REVIEW

At the hearing held on April 25, 1989, respondent moved the admission of a document, Vaccine Injury Compensation Program (VICP Medical Review Case No. 18–69V (hereinafter Medical Review), prepared by Dr. Cynthia McCormick, a senior medical officer at the Department of Health and Human Services (HHS). The Medical Review evaluates records filed with the petition and forms the basis for respondent's contesting of petitioner's entitlement to compensation. The document was offered in lieu of sworn testimony.

The Medical Review was made available to petitioner well in advance of the hearing. Respondent's expert, however, did not appear as a witness in these proceedings and was not made available for sworn testimony or cross-examination, either in person or by telephone.

Petitioner objects to the admission of the Medical Review on the basis that the Medical Review is hearsay and does not fall within any exception contained in the Federal Rules of Evidence. Respondent argues that the Medical Review should be admitted because the court is required by the Vaccine Act under section 300aa–13(b)(1) to consider all relevant scientific evidence in making its determination.

---

**9.** In fact, respondent submitted to the court an article which concedes that death following an HHE episode, although rare, occurs. See V. Fulginiti, *Sudden infant death syndrome, diph-* *theria-tetanus toxoid-pertussis vaccination and visits to the doctor; chance association or cause and effect?*, 2 Pediatric Infectious Disease 5 (January 1983).

After considering the arguments of counsel, the matter was taken under advisement and ruling reserved. The parties were asked to address the admissibility of the Medical Review in post-hearing briefs, and the court agreed to rule on the admissibility of the document in its opinion. For the reasons stated below, petitioner's objection to the admission of the Medical Review is sustained.

An opposing party has the right to be informed of defenses that may be raised against its claim with sufficient time to prepare its case. Petitioner in this case had advance notice of the contents of respondent's Medical Review, and as the transcript of the hearing demonstrates, petitioner's own expert knew the contents of the document and, in his testimony, refuted its negative presumptions. Tr. at 96–97. The fact that petitioner has advance notice of the contents of the document, however, is insufficient to overcome its deficiency as admissible evidence.

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Unless it falls within one of the exceptions provided by the rules, or by an Act of Congress, such statement is not admissible. Fed.R. Evid. 802.

The Medical Review is clearly hearsay. It is an out of court statement, prepared by an interested party, prepared in the course of litigation, and is offered for the truth of the matter asserted. The document does not fall within any of the exceptions to the hearsay rule enumerated in the Federal Rules of Evidence. It does not even fall within the catch-all exception that is provided in Federal Rules of Evidence 803(24) or 804(b)(5) because without the opportunity to probe the declarant's expertise or the logic on which the expert's opinion is based, it lacks the equivalent circumstantial guarantees of trustworthiness.

Respondent argues that Congress intended that the Federal Rules of Evidence should be dispensed with or loosely applied in these proceedings. Respondent cites in particular § 300aa–13(b) which provides that the court shall consider "any diagnosis, conclusion, medical judgment or autopsy or coroner's report which is contained in the record ..." The court disagrees with respondent in this regard. The Federal Rules of Evidence provide reasonable guidelines for adversarial proceedings. In cases where petitioner's entitlement to compensation is challenged, the petitioner subjects its own evidence to scrutiny and attack. Petitioner has the same right to challenge evidence presented against its case. There is no compelling reason why the rules should not be applied to vaccine-injury cases—to bring order and consistency to the admission of evidence, and to exclude evidence that, although relevant, is prejudicial.

Respondent, also, overlooks the implications of subsection (c) of the same section. The "record" is defined by subsection (c) as that record established by the court during the course of proceedings under the Vaccine Act. The special master, as an adjunct of the court, is to conduct hearings, to require such evidence as may be appropriate, and to require testimony as may be reasonable. § 300aa–12(c)(2). The special master is under an obligation to conduct those proceedings and establish that record in a manner that is both consistent with the rules and fair.[10] The statute does not require rules of evidence to be relaxed when to do so would unfairly prejudice a party's case and violate the principle of fundamental fairness.

The Medical Review presents expert opinion contrary to that of petitioner's expert. Petitioner has a right to know the basis for those opinions, to learn what sources are being used, and to probe their reliability. Petitioner has a right to cross-examine the witness and to question the contents of the document. The court also

---

**10.** Vaccine Rule 43(a) provides: "If the testimony of witnesses is required, it shall be taken orally unless otherwise provided by an Act of Congress or by these [Vaccine] rules, *or by the Federal Rules of Evidence.*" (Emphasis supplied).

has an obligation to consider the credibility of the expert witness and the relative merits of that expert's conclusions in order to assign weight to the expert's testimony. *See* § 300aa–12(c). The court will not admit such evidence through a report or otherwise, however, without the ability to cross-examine the expert witness. Fairness requires that the Medical Review be excluded.

## III.

## ADMISSION OF DR. McCORMICK'S AFFIDAVIT

During the course of the hearing, counsel for respondent offered as an exhibit an affidavit of Dr. McCormick which contained a more detailed explication of matters contained in the Medical Review, and, in addition, contained new materials. The affidavit was accompanied by a bibliography of articles, a curriculum vitae of Dr. McCormick, a copy of the Medical Review, five articles, (learned treatises), and a memorandum concerning a conversation with Dr. William Parks, the pathologist who performed the autopsy in this case. Petitioner objects to the admission of the affidavit and its accompanying materials. Petitioner argues that it is uncorroborated hearsay, and that, in addition, the document contains hearsay upon hearsay. Moreover, the document was not supplied to petitioner in advance of the hearing. The court reserved ruling on the admissibility of the affidavit and accompanying materials until after counsel had submitted their post-hearing briefs.

With the exception of the bibliography, and the five learned treatises, the affidavit and its accompanying attachments suffer from the same deficiencies as the Medical Review and must be excluded. The court has no objection to admitting the bibliography and the five articles offered by respondent. They are offered, not to present evidence about this particular case, but about the general state of scientific knowledge. Petitioner stated that it had no objection to admitting the articles. Tr. at 165. Therefore, the articles offered by both parties will be made a part of the record.

## IV.

## CROSS–EXAMINATION

■ During the hearing, petitioner raised an objection to cross examination of the witnesses as being in contravention of the letter and spirit of the Vaccine Act. Petitioner argues that the non-adversarial nature of this proceeding makes such questioning improper. Tr. at 58. The court disagrees. The Act permits the special master to require such evidence as may be appropriate for the preparation of proposed findings of fact and conclusions of law. § 300aa–12(c)(2)(A). In the present case, respondent challenges petitioner's entitlement to compensation. This proceeding, therefore, is adversarial in nature, and the court finds that cross-examination is an essential safeguard to accuracy and completeness of testimony, and, in the interest of fairness, is appropriate to the resolution of vaccine-injury cases.

## V.

## AMOUNT OF THE AWARD

### Compensation

The first element of the award in this case, $250,000, is mandated by § 300aa–15(a)(2), which states that an award shall include, "in the event of a vaccine-related death, an award of $250,000 for the estate of the deceased." [11]

### Attorney's Fees

■ *Limitation on Fees.* Petitioner requests $57,577.00 in attorneys' fees for time spent in previous litigation and in the present action—$27,577 in excess of the $30,000 cap imposed by section 300aa–

---

11. Section 300aa–33(2) defines the term "legal representative" as "a parent or an individual who qualifies as legal guardian under the State Law." Janet Manley, Administratrix of the Estate of Lee Ann Matthews and mother of the deceased, is the legal representative of Lee Ann Manley, and is qualified under § 300aa–11 (b)(1)(A) to bring this action.

15(b). Notwithstanding the plain reading of the statute, petitioner argues that only the attorneys' fees incurred in the present action are subject to the $30,000 cap. Petitioner argues further that fees incurred in a prior civil action in the same matter are not subject to the monetary cap. Petitioner bases its statutory interpretation on an overall reading of the Act, the legislative history, and legislative intent. Petitioner's Revised Attorney Fee Methodology, *Manley v. HHS* (No. 88–69V), filed July 5, 1989.

On May 23, 1989, respondent filed its Response to Petitioner's Request For Attorney Fees and Other Costs (hereinafter R. Resp. of May 23, 1989 at ___). In its response, respondent opposes petitioner's challenge to the statutory cap. Respondent argues that the Vaccine Act is a fee-shifting statute. As such, respondent contends that the statute constitutes a waiver of sovereign immunity and must be strictly construed. In support, respondent cites *Martin v. United States*, 12 Cl.Ct. 223, 226 (1987); *St. Paul Fire & Marine Ins. Co. v. United States*, 4 Cl. Ct. 762, 766 (1984). Respondent argues, then, that the court has no choice but to interpret section 300aa–15(b) as applying the $30,000 cap to all such fees requested in this case. R.Resp. of May 23, 1989 at 3.

The court agrees with respondent. The statute clearly includes all fee compensation awarded under section 300aa–15(e) within the cap imposed by section 300a–15(b) [12]. Where the language of the statute is plain, duty of interpretation does not arise and the court is limited to enforcing the statute according to its own terms. *Fordyce v. United States*, 7 Cl.Ct. 591 (1985). The court recognizes the fact that in retrospective cases in which prior actions have been brought, counsel may not be compensated adequately for services rendered during the pendency of the prior action. The court is bound, however, by the statute's restrictions. The court is of the opinion that attorney's fees in excess of $30,000 cannot be awarded.

*Calculation of Reasonable Fees.* This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is to be based upon the "lodestar" model approach. *See Gregson v. Secretary of the Dept. of Health and Human Services*, 17 Cl.Ct. 19, 20–21 (1989). The lodestar is the product of the reasonable hours expended times the reasonable hourly rate. The resulting figure is an objective estimate, presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, at 434, 103 S.Ct. 1933, at 1939–40, 76 L.Ed.2d 40 (1983). The lodestar figure is subject to adjustment by a number of factors. *See Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th

---

**12.** The relevant sections of the Act read as follows:

(b) Vaccines administered before effective date

Compensation awarded under the Program to a petitioner under section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart ... *may include attorneys' fees and other costs included in a judgment under subsection (e) of this section,* except that the total amount that may be paid as compensation [for lost wages and pain and suffering] and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.

＊　＊　＊　＊　＊　＊

(e) Attorneys' fees

(1) The judgment of the United States Claims Court on a petition filed under section 300aa–11 of this title awarding compensation shall include an amount to cover

(A) reasonable attorneys' fees, and

(B) other costs,

incurred in any proceeding on such petition....

(2) If the petitioner, before the effective date of this subpart, filed a civil action for damages for any vaccine-related injury or death for which compensation may be awarded under the Program, and elected under section 300aa–11(a)(4) of this title to withdraw such action and to file a petition for compensation under the Program, the judgment of the court on such petition may include an amount limited to the costs and expenses incurred by the petitioner and the attorney of the petitioner before the effective date of this subpart in preparing, filing and prosecuting such civil action (including the reasonable value of the attorney's time if the civil action was filed under contingent fee arrangements)....

42 USC § 300aa–15(b), (e) (Supp. V 1987).

Cir.1974) Those factors include, but are not limited to, the time and labor required, the novelty and difficulty of the questions, the skill requisite to perform the legal service properly, and other factors. The fee applicant carries the burden of proof, and contemporaneous time records are required.

■ *Reasonable Hourly Rate.* The reasonable hourly rate is "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The law firm of Schlichtmann, Conway, Crowley & Hugo is a plaintiff's personal injury trial firm. In general, fees charged by this firm are calculated on a contingent basis. Materials initially submitted to the court by petitioner relative to the reasonable hourly rate to be awarded in this case were inadequate for purposes of such calculation. On three separate occasions, the court requested additional documentation. Although additional materials have been supplied by petitioner, such materials are inadequate.

Petitioner claims an hourly rate of $275 for partners, $125 for associates, and $65 for paralegals. Petitioner offers proof of prevailing market rates in the form of an affidavit from another attorney, Rikki J. Klieman, a partner in the law firm of Klieman and Lyons in Boston, Massachusetts. The special master received a facsimile copy of the affidavit with a notation that it would be filed on July 20, 1989. The court's record indicates that it was never filed. It will not, therefore, be considered. Petitioner has submitted also a 1988 survey of the National Law Journal (no citation provided by petitioner) of hourly rates for partners and associates in the 250 largest law firms in the nation, identified by city. The survey lists eight Boston firms. The court notes that the survey lists prevailing rates for top partners in these firms as ranging from $250 to $350 per hour. The survey does not differentiate among the types of firms or the specialized legal expertise represented. The information in the survey does not assist the court in determining whether petitioner's counsel merits the same fee as top rated partners in Boston's top eight law firms.

Petitioner provides insufficient information as to reasonable rates in the community for attorneys of comparable experience and for similar services in his particular field. Counsel in the present case may well merit $275 per hour, as one of the top lawyers in his city, but he has not submitted adequate documentation to permit the court to make that determination. Information concerning the rates charged by the defense bar in the type of cases typically handled by petitioner's firm would be more directly to the point in convincing the court otherwise.

The court takes judicial notice of the fact that Congress has permitted attorneys' fees under the Equal Access to Justice Act to remain at $75 per hour. *See* 28 U.S.C. § 2412(d)(1)(A) (Supp III 1985). In *Lucero v. City of Trinidad,* the 10th Circuit Court awarded that amount when the attorney failed to provide documentation as to fees. 815 F.2d 1384 (10th Cir.1987). This is not to say that the court expects counsel to accept an unreasonably low fee. The court, however, needs some basis to establish a reasonable fee under the particular circumstances of this case. It is clear that Congress intended adequate, but not necessarily the highest hourly rates to be awarded in vaccine-injury cases. *See* H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 22 (1986), *reprinted in* 1986 U.S.Code Cong. & Ad. News 6344, 6363. The court is inclined in this case to base the calculation of reasonable attorneys' fees on $75 per hour. However, as discussed on page 815 *infra,* it is unnecessary to make that determination since petitioner has exceeded the cap of $30,000.

Counsel has documented the legal services provided to petitioner by the number of hours expended, the dates, the character of the service performed, and the person providing the service. In addition, the hourly

rate requested has been adjusted to reflect the lower rates charged in past years.

Petitioner claims a total of 337.9 hours allocated as follows:

For the period May 1, 1985 to December 31, 1985:

| | | | |
|---|---|---|---|
| Partners: | 94.75 hours @ $150.00/hour, | $14,212.00 |
| Associates: | 9.00 hours @ $100.00/hour | $900.00 |
| Paralegals: | 21.25 hours @ $ 50.00/hour | 1,062.50 |
| TOTALS: | | $16,174.50 |

For the period January 1, 1986 to December 31, 1986:

| | | | |
|---|---|---|---|
| Partners: | 51.50 hours @ $200.00/hour, | $10,300.00 |
| Associates: | 20.00 hours @ $125.00/hour | 2,500.00 |
| Paralegals: | 27.25 hours @ $ 65.00/hour | 1,771.25 |
| TOTALS: | | $14,571.25 |

For the period January 1, 1987 to December 31, 1987:

| | | | |
|---|---|---|---|
| Partners: | 12.50 hours @ $225.00/hour, | $ 2,812.50 |
| TOTALS: | | $ 2,812.50 |

For the period January 1, 1988 to Present date:

| | | | |
|---|---|---|---|
| Partners: | 99.25 hours @ $275.00/hour, | $23,856.25 |
| Paralegals: | 2.50 hours @ $ 65.00/hour | 162.50 |
| TOTALS: | | $24,018.75 |
| TOTAL FEES | | $57,577.00 |

---

Petitioner's Revised Statement of Fees and Expenses, filed July 5, 1989.

Petitioner's documentation contains discrepancies. For example, 99.25 hours at $275 per hour for the period January 1, 1988 to present date amounts to 27,293.75 not 23,856.25. As well, petitioner's summary of hours for the period January 1, 1988 to present date, as documented in Petitioner's Statement of Costs & Expenses, filed May 11, 1989, contains errors of addition. The document indicates, not a total of 99.25 hours, but 88.84 hours for the period claimed. These errors may be inadvertent, but they indicate a careless preparation of documentation that does not inspire confidence.

In sum, petitioner claims a total of 337.9 hours of legal services: 258 hours for partners, 29 hours for associates, and 50.9 hours for paralegals. Even if the court were to allow all hours claimed, applying the $30,000 cap, reimbursement would amount to less than $75 per hour. Discussion of what constitutes a reasonable hourly rate in this case, therefore, is of little consequence. The court is powerless to award a larger fee.

### Costs and Expenses

Finally, the court feels compelled to comment on petitioner's claim for expenses. Petitioner claims expenses amounting to $7,114.05, and lists twelve items. *Id.* The items are merely names with a dollar figure given, e.g. "Taxi—$25.00" "Continental Airlines—$955.49" "J.W. Marriott—454.53" "Mark Thoman, M.D.—$300.00". *Id.* No further explanation or documentation is given. Without more, the court is unable to assess the reasonableness of the expenses. Petitioner does not list such obvious costs as filing fees. Therefore, the expenses as listed can be neither approved nor disapproved. If counsel wishes to submit further documentation or explanation, such as a brief description of the charge, the date, and the purpose of the activity, petitioner is free to do so. It will not, however, affect the total amount that can be awarded as costs and fees.

Although petitioner's counsel has not fulfilled the court's expectation in documenting costs and fees, he has rendered a valuable service to petitioner and is entitled to

compensation. An award of $30,000 for attorneys' fees is recommended.

### CONCLUSION

This case appears to be appropriate for an award under the National Vaccine Injury Compensation Program, and the amount of $280,000 appears to be an appropriate figure for that award. It is hereby recommended that the court enter a judgment in favor of petitioner in that amount.