Lisa MUNN, Personal Representative
of the Estate of Chelsea
Vukelich, Petitioner,

v.

The SECRETARY OF the DEPART-
MENT OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 91–5020.

United States Court of Appeals,
Federal Circuit.

July 23, 1992.

Michael R. Hugo, Schlichtmann, Conway,
Crowley & Hugo, of Boston, Mass., argued,
for petitioner.

Laura Radack, Trial Atty., Torts Branch,
Civil Div., Dept. of Justice, of Washington,

D.C., argued, for respondent. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., Helene M. Goldberg, Director, Torts Branch, Civil Div., John Lodge Euler, Deputy Director and Charles R. Gross, Asst. Director.

Before MICHEL, Circuit Judge, COWEN, Senior Circuit Judge, and PLAGER, Circuit Judge.

PLAGER, Circuit Judge.

In this case we are being asked whether the loss sustained by the family of Chelsea Vukelich as a result of her tragic death in childhood qualifies for compensation under the National Vaccine Injury Compensation Program (the Program).[1] The Claims Court, upon review of the decision of the special master, has said no. Before we exercise our appellate review authority, we must first clarify the nature and scope of that authority.

Specifically, we must address the role Congress has left to the Court of Appeals following the *sui generis* trial-and-appellate-review obligations given to the Claims Court by the 1989 amendments to the Program. The question deserves careful examination. It bears not only on the case before us today, but on the large number of vaccine compensation cases to be decided by the Claims Court in the years ahead, and which may be appealed to this court. The question has been addressed in recent cases before this court, but significant aspects remain unsettled, aspects important to the resolution of this case.[2] Once the scope of our review is clarified, we can determine, in light of that scope, whether the injury at issue qualifies as a compensable injury under the Program.

Petitioner, Lisa Munn, as personal representative of the estate of Chelsea Vukelich (Chelsea), sought compensation under the Program for the death of Chelsea. Chelsea, age 4 months, received her second DTP (diphtheria-tetanus-pertussis) inoculation[3] on December 1, 1986. On December 5, she died. Petitioner sought $250,000 as compensation for a vaccine-related death, as well as attorney fees and expenses. Compensation was denied by a special master of the United States Claims Court in *Munn v. Secretary of the Dep't. of Health and Human Servs.*, No. 89–71V (Cl.Ct. May 15, 1990) (hereafter *Opinion of Special Master*). A judge of the Claims Court, after conducting on motion by the petitioner the review required by the statute, affirmed the denial in *Munn v. Secretary of the Dep't. of Health and Human Servs.*, 21 Cl.Ct. 345 (1990). This appeal followed.

## I. BACKGROUND

### A. Factual Background

Chelsea was born on July 26, 1986 with no apparent abnormalities. She appeared healthy before and shortly after October 21, 1986 when she received her first DTP vaccination and her first dose of oral polio vaccine. She later developed a cough and fever. On November 17, her mother took her to the doctor where the cough was diagnosed as possible early otitis media, and amoxicillin was prescribed. Chelsea went for a follow-up visit on December 1 still suffering from what her mother described as a slight cold and cough. Chelsea was given her second DTP inoculation during that visit.

Chelsea slept more than usual and ate less than usual following the inoculation. This was similar to her reaction to the first inoculation. She awoke late on December 2 acting cranky and having a deep cough. She ate less than usual and screamed "a high-pitched screech" that night, as if in

1. 42 U.S.C. §§ 300aa–10 through 300aa–34 (1988 & Supp. I 1989).

2. *See, e.g., Hines v. Secretary of the Dep't of Health and Human Servs.*, 940 F.2d 1518 (Fed. Cir.1991), and *Grant v. Secretary of the Dep't of Health and Human Servs.*, 956 F.2d 1144 (Fed. Cir.1992); *compare Johnson v. Secretary of the*

*Dep't of Health and Human Servs.*, 968 F.2d 1227 (1992) (nonprecedential).

3. This combination of vaccines is sometimes listed with tetanus second, as here, and sometimes third, in which case the abbreviation is DPT. The special master used the former order, and it is the order and abbreviation used here.

pain. Her mother took Chelsea to the emergency room on December 3 where her mother described her as "crying—trouble breathing—feels warm." *Opinion of Special Master* at 5. Chelsea was diagnosed as suffering from acute febrile illness of unknown etiology. Her mother was told to return that evening for a follow-up examination. At the evening examination, Chelsea's mother was told that everything was all right.[4]

On December 4, Chelsea was quiet all day. She appeared weak and did not want to eat. She slept all night. She seemed improved on the morning of the fifth but in the early afternoon, she was not responsive and holding her was described as "like holding a bag of rags." *Id.* at 6. Chelsea was gray and had a fever. By late afternoon, Chelsea seemed better and she was dressed to go to a baby sitter. She was asleep when she arrived at the baby sitter's home. She was found unconscious later that evening and rushed to the same hospital emergency room that had seen her on December 3. Chelsea arrived at the hospital at 9:25 p.m. in full cardiac arrest. She was pronounced dead at 10:00 p.m. The autopsy found that Chelsea died from Klebsiella pneumonia.

### B. The Statutory Framework

Subchapter XIX of Chapter 6A, Title 42 United States Code, enacted in 1986 (though the Program as such was not in effect until October 1988), established the National Vaccine program within the Department of Health and Human Services. The program was established "to achieve optimal prevention of human infectious diseases through immunization and to achieve optimal prevention against adverse reactions to vaccines." 42 U.S.C. § 300aa–1. Subchapter XIX also established the National Vaccine Injury Compensation Program "under which compensation may be paid for a vaccine-related injury or death." 42 U.S.C. § 300aa–10(a).

---

**4.** There appears to be some question as to whether Chelsea was taken for this follow-up examination. The special master suggests that she was taken for the follow-up, *Special Master's*

In general, a person seeking payment from the government under the Compensation Program may establish entitlement on either of two bases. The one, much the easier as an evidentiary matter, is to show that the injury or condition is one of those listed in the Vaccine Injury Table (Table), 42 U.S.C. § 300aa–14; that the manifestation of the injury occurred within the time frame given in the Table; and that the other requirements of § 300aa–13(a)(1) have been met. *See* Schwartz & Mahshigian, *National Childhood Vaccine Injury Act of 1986: An Ad Hoc Remedy or a Window for the Future?*, 48 Ohio St.L.J. 387, 390 (1987). The Program presumes causation for a Table injury. In other words, if the injury is within the requirements described, it is presumed to have been caused by the vaccine. H.Rep. No. 908, 99th Cong., 2d Sess. 18, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6344, 6359.

If the injury or condition is not listed in the Table, or if its symptoms or manifestations are not seen within the time frames specified, recovery under the Program may still be had. But now a more difficult evidentiary showing is required. The claimant must prove by a preponderance of the evidence that the vaccine, and not some other agent, was the actual cause of the injury. Given the vagaries of human illnesses, particularly in young children, that is not always an easy burden to carry.

For the administration of DTP, the Table lists the following occurrences and a related time period for first symptom or manifestation of onset or of significant aggravation after vaccine administration:

A. Anaphylaxis or anaphylactic shock—24 hours

B. Encephalopathy (or encephalitis)—3 days

C. Shock-collapse or hypotonic-hyporesponsive collapse—3 days

D. Residual seizure disorder in accordance with [§ 300aa–14(b)(2) ]—3 days

*Opinion* at 6; however, the medical review filed by respondent on March 7, 1990 states that Chelsea was not taken for the follow-up.

E. Any acute complication or sequela (including death) of an illness, disability, injury, or condition referred to above which illness, disability, injury, or condition arose within the time period prescribed. . . .

42 U.S.C. § 300aa–14(a)(I).

## C. Decision of the Special Master

*i. No Encephalopathy Occurred.* Under the Act, a petition for compensation is first heard by a special master, a new office created as a part of the Claims Court. In this case, the designated special master considered that Chelsea's unusual screaming and persistent crying were compatible with an encephalopathy, but, referencing § 300aa–14(b)(3)(A), concluded that these symptoms in and of themselves were not conclusive evidence of encephalopathy. *Opinion of Special Master* at 7. The special master noted that "the presence of an encephalopathy usually can be documented by slow wave activity on an electroencephalogram [ (EEG) ], however, no EEG was performed on Chelsea." *Id.* The special master also determined that the autopsy did not show any brain damage. Reviewing the evidence, the special master determined that the reported symptoms, considered in the context of the full record, did not support a finding that Chelsea suffered an encephalopathy within three days following the December 1 DTP vaccination. *Id.*

*ii. Hypotonia Did Occur.* The special master cited § 300aa–14(b)(1) for the proposition that a

hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, . . . loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, . . . or cardiovascular or respiratory arrest.

Chelsea exhibited a "decrease in muscle tone, loss of color, unresponsiveness or reduced responsiveness to environmental stimuli, depression of consciousness, and ultimately, cardiac and respiratory arrest (although this occurred beyond the 72 hour time frame)." *Opinion of Special Master* at 7. However, while the special master also found that the hypotonia did occur on December 4, the third day following the vaccination, he concluded that "it may very well have been caused by the developing pneumonia in Chelsea's lungs." *Id.* at 8. Likewise, the special master found that the "fever, drowsiness and anorexia which Chelsea experienced during the first day or two following her vaccination are common reactions . . . ." *Id.* Further, the emergency room diagnosis on December 3 "specifically noted that Chelsea was not septic." *Id.*

*iii. Chelsea Acquired Pneumonia Independently of the DTP Vaccination.* The special master concluded that some of the symptoms Chelsea exhibited, including coughing, runny nose, diarrhea and fever, had persisted at least two weeks prior to the DTP vaccination. Petitioner's expert witness testified that Chelsea's fever, deep cough and loss of appetite were explainable by the Klebsiella pneumonia. Only the high-pitched screaming would not be fully explained by the pneumonia. On the other hand, the expert testified, only Chelsea's cough, which predated her second DTP vaccination and worsened following the vaccination, could not be explained by the vaccination. *Id.*

The special master noted that both pneumonia and pertussis can produce hypotonic-hyporesponsive reactions and that Chelsea's white blood cell count was higher than would be expected from the DTP alone. Therefore, the special master concluded, Chelsea was infected with the pneumonia prior to or at about the same time she received the second DTP vaccination and "the onset of the pneumonia was independent of the administration of the DPT vaccination." *Id.*

Further, the special master considered two studies presented in support of Petitioner's contention that a DTP vaccination renders the recipient more susceptible to infection. The special master found that neither study provided a basis for concluding that the DTP vaccine made Chelsea more susceptible to the pneumonia.

*iv. Chelsea's Death was Due to the Pneumonia.* Section 300aa–14(a)(I)(E) makes compensable

> [a]ny acute complication or sequela (including death) of an illness, disability, injury, or condition referred to [in the Table] which illness, disability, injury, or condition arose within the time period prescribed.

The special master determined that because Chelsea's death did in fact follow the vaccination, it was a "sequela".[5] However, a preponderance of the evidence showed that "her death was not caused by the hypotonic-hyporesponsive episode.... It was a sequela temporally, but not causally." *Opinion of Special Master* at 10.

Further, having concluded that Chelsea was experiencing symptoms related to the pneumonia, the special master noted that Chelsea may also have experienced a reaction to the DTP vaccination. However, even though the pneumonia might therefore be considered an "acute complication" to Chelsea's reaction to the vaccine, the special master held that this did not make her death compensable under the Vaccine Injury Compensation Program because "[a]cute complications and sequelae of Table injuries are not compensable if they are due to factors unrelated to the administration of the vaccine." *Id.* Because all of the symptoms Chelsea displayed, except for the high-pitched screaming, were consistent with pneumonia, Chelsea's symptoms "may reasonably be attributed to the pneumonia." *Id.* at 11. Based on this evidence, the special master held that Petitioner had failed to establish a nexus between the DTP vaccination and Chelsea's death. The special master accordingly denied compensation.

### D. Decision of the Claims Court

Since 1989, either party may file a motion to have the decision of the special master reviewed by a Claims Court judge. (*See* II. STANDARD OF REVIEW, parts A and B, below, for a discussion of the differences between the pre– and post–1989 review process.) In reviewing the record of the proceedings of the special master the Claims Court judge may

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition [filed under § 300aa–11] to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2) (Supp. I 1989).

The Claims Court judge in his opinion agreed that the special master did find that Chelsea suffered a hypotonic-hyporesponsive episode within 3 days following vaccination. However, the judge disagreed with Petitioner's argument that this meant that a Table injury was found. *Munn,* 21 Cl.Ct. at 350. Citing § 300aa–13(a)(1)(A) and (B), the opinion states that

> compensation shall be awarded under the [Vaccine Injury Compensation] Program to a petitioner *if the special master or court finds on the record as a whole* that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by [§ 300aa–11(c)(1)], *and* that there is not a preponderance of the evidence that the illness disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

Petitioner seeks compensation for Chelsea's death, which followed the hypotonia. In order to be compensable, the death must be an acute complication or sequela of the hypotonia, or Chelsea

---

**5.** The special master offered two definitions for a sequela. A sequela "is generally defined as '[s]omething that follows, esp. a pathological condition resulting from a disease.'" *Special Master's Opinion* at 9 (quoting The American Heritage Dictionary 1119 (2nd College ed. 1985). A sequela "is also defined as 'any lesion or affection following or caused by an attack of disease.'" *Id.* (quoting Dorland's Illustrated Medical Dictionary 1509 (27th ed. 1988).

must have sustained or have had significantly aggravated the pneumonia because of the vaccine.

*Munn,* 21 Cl.Ct. at 350–51 (emphasis in original, citations omitted).

Applying the statutory standard of review, the Claims Court judge did not find any factual findings or conclusions of the special master to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The special master's conclusions that the pneumonia was not an acute complication of the hypotonic-hyporesponsive episode, that Petitioner failed to establish that Chelsea was made vulnerable to the pneumonia by the DTP vaccine, and that it was the independently acquired pneumonia and not the vaccination which led to Chelsea's death, were all found supportable. Thus the decision of the special master was sustained.

## II. STANDARD OF REVIEW IN THE COURT OF APPEALS

### A. Standard of Review Prior to the 1989 Amendments

When the vaccine compensation program was created by Congress, it was anticipated that a substantial number of cases requiring these fact-specific determinations would have to be made. Claimed injuries from these vaccines were already in litigation on a variety of common law theories, and it was recognized that, because of the nature of these vaccines, future cases were unavoidable. *See generally* H.Rep. No. 908, 99th Cong., 2d Sess. 6–7, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6346–48.

Congress recognized that expeditious resolution of a large number of new and heavily fact specific claims would require additional personnel—the cases could not simply be added to the existing workload of an agency or court. Two options were available. One was to assign some sort of

initial fact finding/determination role to an administrative agency or extra-judicial body. Another option was to keep the process entirely within the court system. Congress first considered a proposal that claims be resolved by a panel of persons selected from a list, provided by the Secretary of Health and Human Services, of individuals in the region in which the claimant resides who are willing to serve as members of a hearing panel. Participants in the hearing process would have been required to waive their right to trial and the decision of the hearing panel was to be binding and not subject to any administrative or judicial review. H.R. 1780, 99th Cong., 1st Sess. §§ 2103–08 (1985). This approach ultimately was discarded, and Congress turned instead to a court-based process.

After first giving jurisdiction to the district courts, 42 U.S.C. § 300aa–11(a)(1) (Supp. IV 1986),[6] Congress reconsidered and gave jurisdiction to the Claims Court. 42 U.S.C. § 300–11(a)(1) (Supp. V 1987). Congress created within the Claims Court an Office of Special Masters, and authorized the employment of qualified individuals to perform the fact finding function for the Program. Omnibus Budget Reconciliation Act, Pub.L. No. 101–239, § 6601, 103 Stat. 2106, 2286–88 (1989).[7] The role spelled out in the statute for the special master was to take evidence and *propose* findings of fact and conclusions of law for consideration by the Claims Court judge. 42 U.S.C. § 300aa–12(c)(2) (Supp. V. 1987). The Claims Court judge was free to "undertake a review of the record ... and ... make a de novo determination of any matter and issue its judgment accordingly...." 42 U.S.C. § 300aa–12(d)(1) (Supp. V. 1987).

In turn, this court's review of the Claims Court's determination was authorized by

---

**6.** As originally enacted in 42 U.S.C. §§ 300aa–11(a)(1) & 300aa–12 (Supp. IV 1986), the Program called for vaccine cases to be brought before district courts and appealed to the various regional circuit courts of appeal.

**7.** The office of special masters "shall consist of no more than 8 special masters," one of which is to be designated by the judges of the Claims Court as the chief special master. A special master shall be appointed for a term of 4 years. Budget Reconciliation Act, Pub.L. No. 101–239, § 6601, 103 Stat. at 2287.

§ 300aa–12(e) (Supp. V. 1987), which stated that '

> [t]he findings of fact and conclusions of law of the United States Claims Court on a petition shall be final determinations of the matters involved, except that [the parties] may obtain review of the judgment of the court in the United States court of appeals for the Federal Circuit. . . .

No express standard for our review was stated.

In *Bunting v. Secretary of the Dep't. of Health and Human Servs.*, 931 F.2d 867, *reh'g denied*, this court considered, as a matter of first impression, the nature and scope of our review of cases so appealed. We concluded that we "review the Claims Court's decision for correctness of law, and clear error in its factual findings." *Id.* at 871. This formulation is the standard one applied by courts of appeals to appeals from judgments of trial courts. *See* Fed. R.Civ.P. 52(a).

### B. Standard of Review Since the 1989 Amendments

#### 1.

For a number of reasons, Congress found the pre–1989 structure for the resolution of these cases unsatisfactory. *See generally* 135 Cong.Rec. H9475–77 (daily ed. Nov. 21, 1989). Consequently, in 1989 Congress altered the roles of the special master and the Claims Court judge. Under the amended § 300aa–12(d), the special master no longer makes proposed findings of fact or conclusions of law; the special master now "issue[s] a decision . . . with respect to whether compensation is to be provided under the Program and the amount of such compensation."

The Claims Court, on motion by a party, may sit in review of the decision of the special master, based on the record of the proceedings. § 300aa–12(e). As noted earlier, the Claims Court judge may take one of three actions: (1) the judge may uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision; (2) the judge may set aside some or all of the findings of fact and conclusions of law of the special master, and issue different findings of fact and conclusions of law. To do this, however, requires that the judge first find that the disapproved findings and conclusions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or (3) the judge may do neither, but instead may remand the petition to the special master with instructions for further proceedings. *See* 42 U.S.C. § 300aa–12(e)(2).

The effect of this is to give the special master's determinations decisional effect, and to place the Claims Court judge in the role of a reviewing judge. The findings of fact and conclusions of law of the special master may be set aside only if found violative of the standard of review set forth in the statute, a standard of review which is highly deferential to the factual findings of the special master. Absent that, the special master's decision is final, and the clerk of the Claims Court is mandated to enter judgment in accordance with the special master's decision. § 300aa–12(e)(3).

The statutory provision for further review by this court remains essentially unchanged. *See* 42 U.S.C. § 300aa–12(f) (Supp. I 1989). The section of the statute which, prior to the 1989 amendments, stated this court's authority to review (but did not specify the standard to be applied), simply was renumbered and retained.[8]

In view of this statutorily mandated review relationship between the Claims Court judge and the special master, and the absence of a specified standard of review for the Court of Appeals, it is necessary that an appropriate role for this court be identified and clearly articulated. It must of course be one that carries out the Congressional purpose and intent in mandating this rather unique decisional structure.

#### 2.

The way in which the petitioner and the respondent framed the issues on appeal

---

**8.** There was a minor clarification added regarding the running of the time for appeal.

highlights the need to clarify the appellate role. Petitioner Munn frames the issues on appeal in terms of "whether the special master's medical findings were an abuse of discretion." Respondent Secretary states the issues in terms of "whether the Claims Court committed clear error ..." Previous opinions of this court, both precedential and nonprecedential, have described our review role in various ways, leaving some question as to its exact scope.[9]

The problem is simplified somewhat, although not entirely resolved, by a close reading of the statutory section, 300aa–12(f), providing for this court's review. When read in the light of the structure just described, the review role of this court is narrowed considerably. The section states: "The findings of fact and conclusions of law of the *United States Claims Court* on a petition shall be final determinations of the matters involved, except that [the parties] may obtain review of the *judgment* of the court in the United States court of appeals for the Federal Circuit ..." (Emphasis added.)

■ Close attention to the statute tells us several important things. First, no appeal is provided to this court from the decision of the special master. It is only the Claims Court that is subject to review here. Second, it is the final *judgment* of the Claims Court that we review. We know from the previous discussion that the statute contemplates that fact finding will be done by the special master. Only in extraordinary cases will the Claims Court undertake to do any independent fact finding. In arriving at its judgment, the only time the Claims Court can make its own findings of fact is when that court, as a matter of law, has concluded that the special master was 'arbitrary and capricious' (the phrase 'arbitrary and capricious' will be used in this discussion as a shorthand reference to the longer standard described earlier; *see* § 300aa–12(e)(2)(B)), and that it

is necessary for the Claims Court to substitute its own findings of fact. Absent that, there are no separate findings of fact by the Claims Court.

### 3.

This much then is clear. Under the 1989 amendments it is the judgment of the Claims Court that we review directly, and only indirectly the decision of the special master. Issues of law—constitutional imperatives, statutory construction, procedural requirements—come to us for decision with little if any deference owed to or expected by the forums below. With regard to both fact-findings and fact-based conclusions, the key decision maker in the first instance is the special master. The Claims Court owes these findings and conclusions by the special master great deference—no change may be made absent first a determination that the special master was 'arbitrary and capricious.' This is a standard well understood to be the most deferential possible. M. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D.L.Rev. 469, 476 (1988); *see generally*, 2 *Childress and Davis, Standards of Review* § 15.7 (1986).

When a case comes before us in which the Claims Court has upheld the findings and conclusions of the special master against a charge that they were arbitrary and capricious, and the Claims Court has rendered judgment accordingly, it follows that the Claims Court's judgment is entitled to at least the same deference by us as that accorded the special master by the Claims Court. That is, we may not disturb the judgment of the Claims Court unless we find that judgment to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[10]

This standard is consistent with and elaborates upon the standard for review of post–1989 vaccine compensation cases first

---

**9.** *See* cases cited, footnote 2, *supra*.

**10.** These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious

standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

enunciated in *Hines v. Secretary of the Dep't of Health and Human Servs.*, 940 F.2d 1518 (Fed.Cir.1991).[11] Any other standard would create an anomalous situation, one in which the affirming decision (the Claims Court's judgment) was more readily overturned than the original decision (that of the special master).

Establishing that the Claims Court's judgment was, with regard to the facts of the case, arbitrary and capricious is not an easy task for an appellant. When the case comes to us in that posture, the "findings of fact" of the Claims Court referred to in the statutory section providing for our review are actually the factual findings and fact-based conclusions of the special master. The decision rendered by the Claims Court judge necessarily incorporates a conclusion that these findings were not arbitrary or capricious, and thus stand. Clearly it is not then the role of this court to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence. And of course we do not examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder.[12]

We do not say that this is a burden no petitioner can carry. It is possible to hypothesize a case, for example, in which a special master rendered a decision when no factual basis whatever existed under which the decision could be justified. Presumably such a decision, if a petition for review by the Claims Court was requested, would be returned by the Claims Court to the special master for further proceedings.

But one can hypothesize a case in which either that was not done, or if done the error was not corrected, and the Claims Court nevertheless affirmed. This court on appeal could exercise its review authority to find the Claims Court's judgment arbitrary and capricious. However, as we shall shortly explain, this clearly is not such a case.

The situation that we have been describing, which is the one before us, can be compared to the situation in which the Claims Court has found some of the fact-based determinations of the special master to be arbitrary and capricious, and has substituted others. In such a situation, there are at least two possibilities for the scope of our review of these new findings. One is that the same standard enunciated above should apply: the judgment of the Claims Court should be affirmed unless it is found to be arbitrary and capricious. An alternative theory, however, might be that the new factual determinations by the Claims Court would not carry with them the deference the statute accords to findings of the special master. It is, after all, the special masters to whom Congress has accorded the status of expert, entitling them to the special statutory deference in fact-finding normally reserved for specialized agencies.

The Claims Court, when it independently engages in fact-finding, is not exercising expertise beyond that of a trial court in the usual course. Under this theory we would review the new factual determinations of the Claims Court under the same standard by which we review trial court

11. The *Hines* opinion did not elaborate on what was meant by the phrases in that opinion that "we review *de novo* the Claims Court's determination ..." and "[i]n effect then, we review the underlying decision of the special master." *Hines,* 940 F.2d at 1524. Whether our elaboration of the standard of review in this opinion "limit[s] or conflict[s] in any way" with this language in *Hines* (*see* the concurring opinion, *infra*), depends to some extent on what one assumes was meant by these phrases in the first instance. As indicated, we believe the gloss we have added by the explanation of how this standard works operationally is consistent with *Hines,* and should serve to reduce if not eliminate unwarranted appeals of fact disputes.

12. Arguably analogous limitations on the scope of our appellate review, dictated directly or indirectly by other statutes, are found in *Scroggins v. United States,* 397 F.2d 295, 297, 184 Ct.Cl. 530, *cert. denied,* 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968) and *Lindahl v. Office of Personnel Management,* 470 U.S. 768, 791, 105 S.Ct. 1620, 1633, 84 L.Ed.2d 674 (1985), *reversing* 718 F.2d 391 (Fed.Cir.1983) (dealing with the scope of review of certain OPM determinations), and in *Prenzler v. Derwinski,* 928 F.2d 392, 393 (Fed.Cir.1991) (dealing with the scope of review of appeals from the Court of Veterans Appeals).

fact findings in other contexts, and by which we review Claims Court determinations in vaccine compensation cases under the pre–1989 amendments—are they clearly erroneous.

How much difference, if any, these different articulations of the standard of review would make in actual practice is a matter for academic debate. Since the case before us does not require us to decide the issues raised by this alternative scenario, we need not address them further.

### C. The 1989 Amendments Apply to This Case

The 1989 amendments apply to: 1) petitions filed after December 19, 1989 and 2) petitions pending as of December 19, 1989 in which the evidentiary record is not closed, with provision for an immediate suspension for 30 days of all pending cases. 42 U.S.C. §§ 300aa–10 and –12, notes on effective date of 1989 amendments (Supp. I 1989) (emphasis added). Petitions pending as of December 19, 1989 in which the evidentiary record *is* closed proceed under "the law in effect *before* the date of enactment [of the 1989 amendments]." 42 U.S.C. § 300aa–10, note on effective dates (Supp. I 1989) (emphasis added). In the present matter, the petition was filed on June 28, 1989. However, as of December 19, 1989, the evidentiary record had not closed. Therefore, the 1989 amendments apply to this case and to the roles of the special master, the Claims Court, and this court.

This case was appealed and argued at a time when the Court of Appeals had not yet spoken definitively regarding the standard of review. Under the circumstances, and out of fairness to the litigants, we have examined the factual findings and conclusions that underlay the Claims Court's decision—that is, the special master's findings and conclusions as upheld by the Claims Court—with more care than the standard we here articulate requires in order to ascertain whether they were wrong under any arguably-applicable standard. On the record before us we find no such error.

### III. IS THE INJURY COMPENSABLE?

#### A. The Decision of the Claims Court

##### 1. *Factual Issues*

Regarding the evidence of an encephalopathy, the special master reviewed the record as a whole, including the autopsy report and the evaluations of Chelsea's condition in the emergency room on December 3, before concluding that the Petitioner failed to establish that an encephalopathy had occurred.

As to Chelsea's hypotonic-hyporesponsive episode, the special master determined that the Petitioner had established that the episode had occurred. This satisfied one of the requirements for eligibility for compensation set forth in § 300aa–13(a)(1).

With regard to the second requirement for eligibility, that there is not a preponderance of the evidence that the death was due to factors unrelated to the vaccination, the special master examined whether Chelsea's death was an "acute complication or sequela (including death)" of a Table injury. *See Opinion of Special Master* at 10. Having defined a "sequela" as "a pathological condition resulting from a disease," [13] the special master found that Chelsea's death was neither a complication nor a sequela to the hypotonic-hyporesponsive episode. Rather, he concluded that "Chelsea succumbed to infection" and thus that the pneumonia led to her death. In response to Petitioner's argument that the vaccination made Chelsea more vulnerable to the pneumonia, the special master found Petitioner's evidence unconvincing. *Opinion of Special Master* at 11–12.

█ As discussed earlier, the Claims Court reviewed the decision of the special master, and chose to uphold the special master's findings and conclusions *in toto*. The Claims Court thus determined that the special master had not acted arbitrarily or capriciously in reaching his fact-based findings and conclusions. Petitioner has made no showing that the Claims Court erred as a matter of law in this determination, and

---

**13.** Petitioner does not dispute the special mas- ter's definition of a sequela.

thus has failed to carry her burden on appeal.

## 2. *Legal Issues*

Petitioner raises in addition two legal issues. These we review *de novo*. The first issue is whether the special master improperly considered the medical review prepared by the Vaccine Injury Compensation Branch of the Department of Health and Human Services; and second, whether the special master's finding that a hypotonic-hyporesponsive episode did occur within 3 days following vaccination mandates compensation.

▄ In reaching his determination, the special master considered, *inter alia,* the medical review submitted by respondent. Petitioner objected to the admission into evidence of the review and argues that it should not have been admitted. Petitioner cites the Report and Recommendation for Judgment of the special master in *Manley v. Secretary of the Dep't. of Health and Human Services,* 18 Cl.Ct. 799, 803–16 (1989) for the proposition that the review was improperly admitted because it is inadmissible hearsay under the Federal Rules of Evidence and *Manley* calls for application of the Federal Rules of Evidence to vaccine-injury cases.

*Manley* was decided November 16, 1989, i.e., before the effective date of the 1989 amendments to subchapter XIX. Before the 1989 amendments, § 300aa–12(c)(2) stated, in relevant part, that

> [a] special master shall serve as an adjunct to the court, shall prepare and submit to the court proposed findings of fact and conclusions of law and may—(A) require such evidence as may be appropriate for the preparation of proposed finding of fact and conclusions of law....

Since the 1989 amendments, the statute states that the procedural rules for practice before a special master shall:

> (A) provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions, (B) include flexi-

ble and informal standards of admissibility of evidence, ... (D) include the opportunity for parties to submit arguments and evidence on the record without requiring routine use of oral presentations, cross examination, or hearings....

42 U.S.C. § 300aa–12(d)(2).

Given this change in the statute, the evidentiary discussion in *Manley* is inapplicable. In revising the statute, Congress clearly determined that the Federal Rules of Evidence shall not be applied in vaccine-injury proceedings before a special master. We hold that the special master properly accepted the medical review into evidence.[14]

▄ The second legal question raised by Petitioner is whether the special master's finding that a hypotonic-hyporesponsive episode did occur within 3 days following vaccination mandates compensation. The answer is clearly no. In one of the early proposals for a national vaccine act, the finding of a table injury apparently would have mandated compensation. S. 827, 99th Cong., 1st Sess. § 2105 (1985) ("[C]ompensation shall be provided under the Program if the first manifestation of the onset ... or significant aggravation of any such injury ... occurs within the time period ... as set forth in the [provided table].") However, the Program, as it currently exists, additionally requires that there not be "a preponderance of the evidence that the injury was caused by factors unrelated to the vaccine." 42 U.S.C. § 300aa–13(a)(1)(B). Thus, "the injury is to be considered compensable (unless there is evidence to the contrary, as described above in Section 2113)." H.Rep. No. 908, 99th Cong., 2d Sess. 19, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6360 (§ 2114). The autopsy found that Chelsea died from the pneumonia, not from the administration of the vaccine, and the special master did not find that the vaccination rendered Chelsea more susceptible to the pneumonia. Therefore, under § 300aa–13(a)(1)(B), compensation was properly denied.

---

14. We note that respondent filed the medical review on March 7, 1990 and that hearings were scheduled for April 5, 1990. Thus petitioner had sufficient notice of the content of the medical review to formulate a response, if appropriate.

## IV. CONCLUSION

Petitioner failed to convince the special master that she met her statutory burden and was entitled to compensation. Petitioner also failed to demonstrate to the Claims Court that the decision of the special master was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. Petitioner has not shown that the decision of the Claims Court was incorrect with regard to matters of law, or that the judgment of the Claims Court was otherwise in error under any applicable standard of review. Therefore, the judgment of the Claims Court is affirmed.

*AFFIRMED.*

WILSON COWEN, Senior Circuit Judge, concurring.

I agree with the result reached by the court and concur generally in its opinion, subject to the following:

With respect to our review in vaccine cases after the 1989 amendments to the applicable statute, the opinion states that the standard of review therein set forth is "consistent with and elaborates upon the standard for review of post–1989 vaccine compensation cases first enunciated in *Hines v. Secretary of the Dep't of Health and Human Servs.*, 940 F.2d 1518 (Fed. Cir.1991)."

In *Hines,* the court stated:
in a case arising under the 1989 amendments to the Vaccine Act, we review *de novo* the Claims Court's determination as to whether or not the special master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In effect, then, we review the underlying decision of the special master under the arbitrary and capricious standard of § 300aa–12(e)(2)(B). [Citation omitted].
940 F.2d at 1524.

I join in the court's opinion with the understanding that full effect has been given to our decision in *Hines* and that the opinion does not limit or conflict in any way with the above-quoted statement in that case.