Patricia and June SHYFACE, as Legal
Representatives of the Estate of
Cheyenne Shyface, Petitioners,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 95–272V.

United States Court of Federal Claims.

Sept. 23, 1997.

Curtis R. Webb, Twin Falls, ID, for petitioners.

Michael P. Milmoe and David L. Terzian, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for respondent.

## ORDER

MILLER, Judge.

This matter is before the court on Respondent's Motion for Review and Memorandum of Objections filed on June 30, 1997. Respondent challenges the special master's decision granting compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1—300aa–34 (1994), *amended by* 42 U.S.C.A. §§ 300aa–1—300aa–34 (West Supp.1997) (the "Vaccine Act"). The two main issues upon review are 1) whether the special master failed to address and apply the standards set forth in the revised Vaccine Injury Table regulations and 2) whether the special master failed to require petitioners to demonstrate by a preponderance of the evidence that an encephalopathy caused the infant's death, or, alternatively, that the vaccine in fact caused his death.

## FACTS

The record reveals the following facts. On April 4, 1995, Patricia and June Shyface ("petitioners"), mother and grandmother, respectively, filed a claim for compensation on behalf of the decedent, Cheyenne Michael Shyface ("Cheyenne" or "the infant"). On April 1, 1993, Cheyenne received his first DPT vaccination. Petitioners alleged that the vaccine caused an encephalopathy, which resulted in Cheyenne's death four days later. Respondent argued, however, in its Rule 4 Report and in its Motion of Objections that petitioners failed to satisfy the requirements 42 C.F.R. § 100.3 (1996) ("the Vaccine Injury Table regulations"), for an encephalopathy caused by a DPT vaccination and that the actual cause of death was "an overwhelming E.coli bacterial infection and resulting pneumonia." Resp's Mot. filed June 30, 1997, at 2.

On September 16, 1996, the special master convened a hearing to determine the cause of Cheyenne's death. The special master heard the testimony of petitioners; Gloria Payne–Urbaniak, a Native American legal assistant; Dr. William C. Torch, petitioners' expert; Dr. Lucy Rorke, a neuropathologist testifying as one of respondent's expert witnesses; and Dr. John MacDonald, a pediatric neurologist also testifying as respondent's expert. *See Shyface v. Secretary of DHHS,* No. 95–272V, slip op. at 4, 6 (Spec.Mstr. May 30, 1997).

Based on the testimony of petitioners, the special master found that on April 3, 1993, the infant did not respond either to his caregivers or his surroundings. The special master relied exclusively on petitioners' testimony to ascertain Cheyenne's condition during the four days between his vaccination and the time he was taken to the emergency room at 5:23 a.m. on April 5, 1993. *Id.* at 2; *see also* Transcript of the Proceedings, *Shyface v. Secretary of DHHS,* No. 95–272V, at 23, 53, 59 (Spec.Mstr. Sept. 16, 1996). Deferring to petitioners' testimony and finding the medical opinion of petitioners' expert, Dr. Torch, more persuasive than that of respondent, the special master determined that Cheyenne suffered a table injury, encephalopathy, due to his reduced level of consciousness between April 3–4. *Shyface,* slip op. at 6. The special master's decision did not address the standards set forth in the Vaccine Injury Table regulations regarding the severity and duration of the encephalopathy.

Nevertheless, the special master concluded that petitioners proved by a preponderance of the evidence that Cheyenne suffered an encephalopathy within three days of his vaccination and that this Table Injury was the cause of his death. *Id.* at 8–9. She also concluded that "Cheyenne's death was, in fact, causally related to the administration of the vaccine." *Id.* at 9. Special Master E. LaVon French issued her decision on May 30, 1997, granting petitioners' claim and awarding compensation of $250,000. *Id.*

## DISCUSSION

■ On review of a decision by a special master, the Court of Federal Claims is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C. § 300aa–12(e)(2)(B) (1994). As the Federal Circuit has stated:

"These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by [the Federal Circuit], as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with the law' standard; and discretionary rulings under the abuse of discretion standard."

*Saunders v. Secretary of DHHS,* 25 F.3d 1031, 1033 (Fed.Cir.1994) (quoting *Munn v. Secretary of DHHS,* 970 F.2d 863, 870 n. 10 (Fed.Cir.1992)). Whether the special master applied the revised Vaccine Injury Table is a legal issue that requires statutory interpretation and thus falls under the "not in accordance with the law" standard. *Neher v. Secretary of DHHS,* 984 F.2d 1195, 1198 (Fed. Cir.1993); *Munn,* 970 F.2d at 870 (Fed.Cir. 1992). As a question of law, it is subject to *de novo* review. *See Snyder v. Secretary of DHHS,* 117 F.3d 545, 547 (Fed.Cir.1997); *Flowers v. Secretary of DHSS,* 49 F.3d 1558, 1559 (Fed.Cir.1995); *Saunders,* 25 F.3d at 1033; *Munn,* 970 F.2d at 873. The issue of

whether petitioners' evidence warrants a finding that either the encephalopathy or the vaccine caused Cheyenne's death calls for a review under the arbitrary and capricious standard. *Hines v. Secretary of DHHS,* 940 F.2d 1518, 1527 (Fed.Cir.1991).

The decision of a special master may be deemed arbitrary and capricious only if the special master

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines,* 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

■ Respondent does not challenge the special master's factual determinations regarding the existence of an encephalopathy and fever, both of which were based on the credibility of testimony given by Patricia and June Shyface and their expert, Dr. Torch. However, respondent objects to the special master's decision on several legal grounds. Pointing to the revised Vaccine Injury Table regulations, 42 C.F.R. § 100.3, under which petitioners are required to show several factual elements to establish an encephalopathy, respondent argues that the special master failed to address any of these elements. The Vaccine Injury Table requires a patient to develop symptoms, manifestation, or significant aggravation of an encephalopathy within 72 hours after the vaccine was administered. Encephalopathy is "indicated by a significantly decreased level of consciousness lasting for at least 24 hours" and must be "sufficiently severe so as to require hospitalization." 42 C.F.R. § 100.3(b)(2)(i)–(A). The qualifications and aids to interpretation list three clinical signs that indicate a "significantly decreased level of consciousness": (1) decreased or absent response to environment; (2) decreased or absent eye contact; or (3) inconsistent or absent responses to external stimuli. 42 C.F.R. § 100.3(b)(2)(D).

The special master relied on the oral testimony of petitioners, as well as that of Dr. Torch, to conclude that Cheyenne suffered an encephalopathy on the third and fourth day following his vaccination. *Shyface*, slip op. at 4. The special master noted:

> On the third day of April, [Cheyenne] demonstrated significantly reduced levels of consciousness. He did not respond to his caregivers or to his environment; he would stare when talked to; he would not move his head, grasp, vocalize, smile, or cuddle as before; he took no nourishment, very little water; and he simply lay without response with glazed and staring eyes.

*Id.* at 3. The special master also found that Cheyenne's "condition continued on the third and fourth days without abatement, and no signs of recovery were thereafter observed." *Id.* at 6.

In making this finding, the special master failed to address inconsistent or equivocating testimony from petitioners indicating that Cheyenne's condition actually had improved on the evening of April 4, 1993.* It is unclear from the special master's opinion whether she evaluated this testimony and made a credibility determination that Cheyenne simply had not improved. It is also unclear whether the special master considered the legal standards regarding the severity and duration of encephalopathy set forth in the Vaccine Injury Table regulations. *See* 42 C.F.R. § 100.3(b)(2)(i)–(A). Because the Injury Table standards speak to both the severity and duration of a "significantly decreased level of consciousness," the special master is required to address petitioners' testimony that seems to belie these requisite elements. The special master's findings on these elements are important because the record contains no medical records or other medical documentation, such as an electroencephalogram, to substantiate petitioners' tes-

timony regarding Cheyenne's condition following his vaccination.

■ Respondent also argues that the special master failed to require petitioners to prove that a Table Injury—encephalopathy—actually caused Cheyenne's death. Both an encephalopathy and an E.coli infection were present, according to the experts. The special master accepted Dr. Torch's statement that " 'but for' the vaccine–related encephalopathy, Cheyenne would not have died of the underlying infection." *Shyface*, slip op. at 8–9. She thus concluded that "Cheyenne's death was, in fact, causally related to the administration of the vaccine." *Id.* at 9. However, it is unclear how the special master came to this conclusion, as the transcript reveals that Dr. Torch equivocated as to the cause of death and that his testimony concerned the role of sepsis and Cheyenne's fever, not the role of encephalopathy. When asked on direct examination whether he thought the DPT vaccine caused Cheyenne's death, he answered that it "contributed towards the death." Dr. Torch explained that an endotoxin in both the DPT and the E.coli can cause a high fever, which can lower the infant's ability to respond to an infection. *Id.* He acknowledged that there would be no way to determine whether the infection or the vaccine was more responsible for the fever, especially since no clinical tests were performed prior to the infant's death. He opined that the cause of death was a combination of the vaccine–related fever and sepsis.

In an effort to establish causation, the special master asked two critical questions—the answers to which reveal that Dr. Torch did not hold the opinion that " 'but for' the vaccine–related encephalopathy, Cheyenne would not have died of the underlying infection[ ]", as recited—in the special master's opinion. *Shyface*, slip op. at 8–9.

---

* Regarding Cheyenne's condition from April 3–4, June Shyface testified that the infant "wasn't that sick that night. . . ."; "he looked all right[ ]" the morning of April 4, and "he was all right when [June] left[ ]" for work that morning. June testified that when she returned from work that afternoon, Cheyenne "was a little better. His eyes— he can focus in. . . . ." When the special master asked whether the infant was "back to normal on the 4th?" June replied, "Usual, yeah. He was— I mean he wasn't like he was." When asked whether on the 4th Cheyenne "was a little bit better?" June answered, "Yeah."

The Court: Counsel tried to get you to state whether or not the vaccine was more likely the major cause or the proximate cause or was it the sepsis. Are you able to give an opinion as to which is more likely?

Dr. Torch: I believe that the original symptoms, the first symptoms to the DPT, that there may have been some due to an underlying sepsis. Are you saying that but for the sepsis, this child may not have died? [It appears that this was a restatement of the court's query, or mis–attributed to Dr. Torch in the transcript]. Yes. Again, I don't believe the DPT vaccine alone was responsible for this child's death.

The Court: If the child had had the sepsis alone and no vaccine, do you believe that the child might have lived?

Dr. Torch: Yes.

The Court: Do you believe if the child had had the vaccination and no sepsis, that the child might have lived?

Dr. Torch: Yes.

On redirect examination petitioners' counsel asked Dr. Torch the leading question: "But is it your opinion that but for the DPT vaccination, Cheyenne Shyface would not have died; is that correct?", to which he replied "Yes."

It is difficult to discern from this exchange how the special master concluded that "but for" the encephalopathy, Cheyenne would have lived and that his death was causally related to the vaccine. Dr. Torch focused on the infant's high fever, and not encephalopathy, as a contributing factor to his death. Furthermore, as the court explains below, a causal relationship is insufficient; petitioners must establish actual causation between the vaccine administration and death.

■ The confusion appears to stem from the fact that petitioners attempted to prove their case by both methods contemplated by the Vaccine Act: 1) the two–prong Injury Table method and 2) the actual causation method. *See Shyface*, slip op. at 4. Under the two–prong Injury Table method, a petitioner must establish two circumstances by a preponderance of the evidence in order to recover for a death which follows a DPT vaccination. *Hellebrand v. Secretary of DHHS*, 999 F.2d 1565, 1569–70 (Fed.Cir. 1993). First, a petitioner must demonstrate that one of the three injuries or conditions listed in the Vaccine Injury Table—here encephalopathy—occurred within the requisite three–day period. Second, a petitioner must show that death was a sequela of, or "actually caused by," the injury or condition on the table. *Id.* at 1569; *see* § 300aa–14(a)(I); 42 C.F.R. § 100.3(b)(5). Death itself is not compensable unless it is a sequela of a table injury, *i.e.*, encephalopathy. *Hellebrand*, 999 F.2d at 1570. Therefore, *Hellebrand* and the revised Vaccine Injury Table regulations themselves belie the special master's assertion that once a table injury is shown, causation is presumed. *See Shyface*, slip op. at 3. This method of establishing liability requires that petitioners demonstrate that the table injury—the encephalopathy—"actually caused" Cheyenne's death and that the special master make this finding on the record.

■ Alternatively, when no Table Injury is evident, a petitioner can use the actual causation method. "[P]etitioners must show a medical theory causally connecting the vaccination and the injury. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Grant v. Secretary of DHHS*, 956 F.2d 1144, 1148 (Fed.Cir. 1992). The special master's decision does not explain how, on the basis of Dr. Torch's testimony, petitioners have shown actual causation, or a direct nexus between the vaccine and Cheyenne's death.

Therefore, the special master must ascertain whether and exactly how petitioners sustained their burden under either method, or both. In order to determine whether petitioners' evidence fulfills the requirements of the two–prong Injury Table method, the special master must apply the revised Vaccine Injury Table regulations, 42 C.F.R. § 100.3(b)(2)(i)–(A), to determine whether the severity and durational elements of encephalopathy were present.

**CONCLUSION**

Accordingly, based on the foregoing,

**434**

**IT IS ORDERED,** as follows:

1. Pursuant to 42 U.S.C. § 300aa–12(e)(2)(C), this case is remanded to the special master to make the factual findings required by the revised Vaccine Injury Table regulations, 42 C.F.R. §§ 100.3(b)(2)(i)–(A).

2. The special master shall make findings based on petitioners' proof by a preponderance of the evidence with respect to causation by the Injury Table method, the actual causation method, or both.

3. The special master shall make these findings either based on the record as it exists or, at her option, by receiving additional evidence.

4. The special master shall issue a supplemental decision by November 21, 1997.